IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CANDIDO MONTANEZ, JR. ) | CASE NO. 1:11-cv-2475 |
| ) | |
| Plaintiff, ) | JUDGE SOLOMON OLIVER, JR. |
| ) | |
| v. ) | MAGISTRATE JUDGE |
| ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant. ) | |

Plaintiff Candido Montanez, Jr. ("Plaintiff" or "Montanez") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth below, the Administrative Law Judge ("ALJ") failed to reflect, in his Residual Functional Capacity ("RFC") determination and his hypothetical question to the Vocational Expert ("VE"), limitations that he found Montanez to have.  Therefore, the Commissioner's decision should be **REVERSED and REMANDED** for further proceedings consistent with this Report and Recommendation.

## I.  Procedural History

Montanez filed applications for Disability Insurance Benefits and Supplemental Security Income on February 20, 2009.  Tr. 125-131.  His applications alleged a disability onset date of December 1, 2008.  Tr. 125, 129.  Montanez alleged disability based on mental health problems.

Tr. 102, 105, 110, 114, 116, 120, 171. After his applications were denied initially and upon reconsideration (Tr. 102-107, 110-121), through his attorney, Montanez requested a hearing (Tr. 90-96), and an administrative hearing was held before Administrative Law Judge C. Howard Prinsloo ("ALJ") on February 15, 2011. Tr. 26-61.

In his March 7, 2011, decision (Tr. 8-25) the ALJ determined that Montanez had not been under a disability from December 1, 2008, through the date of the ALJ's decision. Tr. 21. Through his attorney, Montanez requested review of the ALJ's decision by the Appeals Council. Tr. 5-7. On September 20, 2011, the Appeals Council denied Montanez's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A.  Personal and Vocational Evidence

Montanez was born on December 20, 1970 (Tr. 125, 129) making him 40 years old at the time of the hearing (Tr. 31). He did not complete the ninth grade. Tr. 33. He resides in his brother's house. Tr. 43. His parents take care of his two children because, according to Montanez, he cannot and has never been able to take care of them. Tr. 44. Montanez was incarcerated for failure to pay child support. Tr. 39, 294. He was also incarcerated for about 2 years for drug related charges. Tr. 268. His past work experience includes installing drywall and working as a short order cook. Tr. 55-56.

### B.  Medical Evidence

#### 1.  Nord Rehabilitation Center ("Nord Center")

On or about October 2, 2008, Montanez first met with a Nord Center counselor while incarcerated for failure to pay child support. Tr. 39, 251. Montanez reported ongoing symptoms of depression, anxiety and hyperactivity related to childhood sexual abuse, substance

2

abuse, risk taking and impulsive behavior. Tr. 251, 272. He also reported problems with concentration dating back to age 17 or 18 and problems with sleeping at night. Tr. 259. While incarcerated, he was diagnosed with post traumatic stress disorder, early onset, chronic, rule out bipolar disorder not otherwise specified; cannabis abuse, rule out cannabis dependence. Tr. 260. Also, Nord Center assessed Montanez with a GAF of 50.[1] Tr. 260. Treatment recommendations, as agreed to by Montanez, included: (1) a psychiatric evaluation to determine medications to control symptoms; (2) increased coping skills; and (3) staying clean and sober (Tr. 260-261), and an Individual Service Plan Goal Sheet was completed (Tr. 271-273).

Following his release from jail, on January 6, 2009, Nord Center Advanced Practice Nurse Nancy Danielson conducted a psychiatric evaluation of Montanez. Tr. 267-270. At the start of the evaluation, Montanez was depressed and angry with the evaluator but, as she explained to Montanez why she was asking certain questions, his behavior became less guarded and, by the end of the interview, Montanez agreed to cooperate in completing certain tasks so that he could begin medication. Tr. 269. He endorsed symptoms of PTSD, depression and anxiety. Tr. 267. Although rare, he indicated that, when his PTSD is severe, he hears voices that, at times, tell him to harm others. Tr. 269. He described his history with substance abuse. Tr. 267. He also reported gambling a lot. Tr. 268. He discussed the childhood sexual abuse that he endured and said that he was hurt by the failure of his parents to validate his feelings. Tr. 267. He reported that, although his mother was raising his children, he visited his children daily. Tr. 268. Nurse Danielson diagnosed Montanez with PTSD, severe; bipolar disorder, NOS;

---

[1] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

3

cannabis dependence; and cocaine abuse. Tr. 269. She assessed a GAF score of 50. Tr. 269. Montanez indicated a willingness to try medication and indicated that he wanted help in learning skills to cope with his PTSD. Tr. 270.

Montanez continued mental health treatment at the Nord Center through December 2010. Tr. 276-290, 325-379, 451-495. Treatment records reflect that Montanez generally responded well to medication. Tr. 276, 355, 365, 369, 454, 470, 484, 488. For example, at a visit on November 9, 2010, Montanez reported that the medication was helping him feel much better. Tr. 454-455. He was still isolating himself but at the visit he was smiling, much calmer and his eye contact was improved. Tr. 454-455. On one occasion, Montanez ran out of medication for two days and his condition worsened. Tr. 489-492.

The Nord Center was involved in assisting Montanez seek social security benefits. Tr. 277, 281, 282, 284. During visits, the Nord Center provided him with instructions as to how to apply for social security. Tr. 277. January 6, 2009, treatment notes reflect that Montanez seemed "inordinately concerned about obtaining SSI" but also note "then again [he] has no income." Tr. 284. On April 3, 2009, Nurse Danielson raised questions about Montanez's motivation for looking up information about his illness, i.e, "was he doing this to learn new skills or to prepare for when he sees the psychologist for social security." Tr. 355.

On September 18, 2009, Montanez was very upset about receiving a denial of his request for social security disability benefits. Tr. 480. Following that denial, on October 10, 2009, Nord Center counselor Carol Redding suggested possible jobs that Montanez might be able to perform that required minimal public contact, but Montanez was disinterested. Tr. 479. Also, following another denial of his request for social security disability benefits, September 15, 2010, treatment notes reflect that Montanez's behavior suggested that he thought the Nord Center was

4

obstructing his requests for social security and he was upset because he knew of other people that the Nord Center had "helped." Tr. 463-464.

On November 9, 2010, Montanez reported being satisfied with his current medications and indicated that it was the first time that he felt that the medications had really been working for him. Tr. 454-455. A month later, during a December 1, 2010, appointment with counselor Carol Redding, Montanez reported that he was feeling much better, sleeping better and could see himself working but wanted Ms. Redding to fill out social security paperwork. Tr. 452-453. He indicated that he would be better able to work and be social if he had income. Tr. 452. During the appointment, Montanez talked of isolating himself but Ms. Redding noted that Montanez took two phone calls during the appointment and during those calls he appeared to be smiling and told the individual at the other end of the call that he was unable to meet him because he was going to the hospital for chest pains. Tr. 452.

On December 1, 2010, Ms. Redding did complete a "Medical Statement for Social Security Disability Claim." Tr. 448-450. She indicated that, generally, Montanez was moderately limited in his ability to maintain social functioning; had no limitations in activities of daily living; no deficiencies in concentration, persistence or pace that would result in frequent failure to complete tasks in a timely manner; and he experiences repeated episodes of deterioration or decompensation in work or work-like settings which cause him to withdraw from the situation. Tr. 448. Of twenty more specific work related limitations, Ms. Redding indicated that Montanez was not significantly impaired in 12 areas. Tr. 449-450. She noted that Montanez was moderately impaired in 6 areas – ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to work in coordination and proximity with others without being distracted by them; ability to complete a

5

normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; ability to respond appropriately to changes in the work setting; and ability to be aware of normal hazards and take appropriate precautions. Tr. 449-450. She also noted that Montanez was markedly impaired in 2 areas – ability to accept instructions and respond appropriately to criticism from supervisors and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 449-450. Ms. Redding indicated that, because of his impairments or treatment, Montanez would likely be absent from work 4 or more days per month and his symptoms would interfere with his ability to maintain attention and concentration to perform even simple work tasks 11-33% of the time - "high occasionally." Tr. 450. She noted that, although the Nord Center offered vocational services, Montanez declined the offer, and she also noted that Montanez expresses a sense of entitlement. Tr. 450.

    **2.**    **Hospital Records**

On July 25, 2010, Montanez was at the emergency room with reports of suicidal and homicidal ideation and decreased sleep. Tr. 383-393. He reported that he had used cannabis the prior week and also that he had stopped taking his prescribed medication, Depakote. Tr. 387. He was discharged that same day. Tr. 393. However, on July 30, 2010, he returned to the emergency room with reports of feeling out of control but denying suicidal ideation. Tr. 399-409. He indicated he would end up in jail if he did not get help. Tr. 400. That same day, he was transferred to Northcoast Behavioral Health and remained there through August 17, 2010. Tr. 419-425.

Notwithstanding positive reports at his December 1, 2010, Nord Center appointment (452-453), on December 23, 2010, Montanez was admitted to Mercy Regional Medical Center after becoming depressed and suicidal as a result of a letter that a Nord Center counselor sent to his lawyer allegedly indicating that they would not support his requests for social security disability. Tr. 428. He reported feeling nervous about not being able to get social security benefits. Tr. 429. The diagnostic impression was bipolar disorder, NOS; cannabis dependence; cocaine abuse; and antisocial personality disorder by history. Tr. 429. His GAF score was 45. He was discharged on January 3, 2011. Tr. 427.

### 3. Consultative Examining Physician

On May 6, 2009, Thomas F. Zeck, Ph.D., examined Montanez. Tr. 301-305. Montanez indicated that he "feels he is unable to work because he cannot get along with others nor does he wish to be around them." Tr. 301. He also indicated that "he would be unable to work because he does not trust himself around people" (Tr. 303) and "cannot work because he has trouble concentrating." Tr. 304. Montanez indicated the he is depressed continually and stated that his depression is related to his sexual abuse which Dr. Zeck noted had not been totally worked through, coped with, or dealt with. Tr. 303, 304.

Dr. Zeck diagnosed post traumatic stress disorder; bipolar disorder, NOS; cannabis dependence, in remission; cocaine abuse, in remission; and personality disorder, NOS. Tr. 305. Dr. Zeck assessed Montanez as having a GAF of 49. Tr. 305. He opined that Montanez's ability to relate to others including fellow workers and supervisors was markedly impaired; his ability to understand, remember, and follow instructions appeared adequate; his ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks was not impaired if Montanez could work in isolation and did not have to interact or relate to others; and his ability

7

to withstand the stress and pressure of day to day work was moderately to markedly impaired. Tr. 305.

### 4. State Agency Reviewing Physician

On May 19, 2009, Carl Tishler, Ph.D., a state agency psychologist, completed a Mental RFC and a Psychiatric Review Technique and he determined that Montanez's impairments did not meet or equal a Listing.[2] Tr. 310-323. He found moderate restrictions/difficulties in Montanez's ability to perform activities of daily living; maintain social functioning; and maintain concentration, persistence or pace; and no episodes of decompensation of extended duration. Tr. 320. In the Mental RFC, Dr. Tishler determined that Montanez would have no more than moderate limitations in 14 of the 20 categories assessed and no limitations in the other 6 categories assessed. Tr. 306-307. Dr. Tishler gave partial weight to the consultative examiner's report. Tr. 308. Dr. Tishler found that, based on information concerning Montanez's activities of daily living, and information from Nord Center, he did not entirely accept Dr. Zeck's findings of marked limitations in relating to others and tolerating stress. Tr. 308. Dr. Tishler opined that, "[a]lthough the claimant would likely perform optimally in a setting that entails minimal interaction, he can relate adequately on a superficial basis." Tr. 308. He opined that Montanez was "limited to jobs that do not require working with the general public. He would do best in more solitary settings although he can relate to his family and the general public for brief shopping. He can adapt to a setting in which duties are routine and predictable." Tr. 308. Dr. Tishler found Montanez's statements to be partially credible but not as to the severity alleged. Tr. 308.

### C. Testimonial Evidence

---

[2] On September 4, 2009, Bruce Goldsmith, Ph.D., affirmed Dr. Tishler's May 19, 2009, assessment. Tr. 382.

### 1. Montanez's Testimony

Montanez was represented by counsel and testified at the administrative hearing. Tr. 30-54, 55-56. When asked whether there was anything special that occurred in December of 2008 that caused his alleged onset date of December 1, 2008, Montanez was unable to articulate a basis for why that was his alleged onset date. Tr. 31-32. He indicated that individuals from the Nord Center always helped him complete his social security disability paperwork and explain his situation. Tr. 32.

Montanez testified regarding his past work installing drywall and working as a cook in various restaurants. Tr. 30-54, 55-56. He testified that he had lost some prior jobs because of verbal or physical altercations with bosses or co-workers. Tr. 47-49.

While incarcerated for failure to pay child support, Montanez started seeing counselors from the Nord Center and he continued to seek treatment following his release. Tr. 39. He admitted to using illegal drugs and alcohol to self-medicate in the past but indicated that he had been working to stay medication compliant with the legal drugs prescribed through the Nord Center. Tr. 40-42, 51-52. He testified that the medication that he takes for his mental health issues causes him to become sedated but indicated that, with medication, he has had success and feels better with medication. Tr. 42, 49-50. However, he stated that, even with medication he cannot work because of his mental issues; he does not and cannot go around other people because he does not trust his ability to control himself. Tr. 42, 50-51, 54. He indicated that he had a very bad childhood. Tr. 43. However, he also indicated that his parents visit him almost daily to check on him and assist him. Tr. 43-44. He testified that he has no physical problems. Tr. 44.

### 2. Vocational Expert's Testimony

Vocational Expert Thomas Nimberger ("VE") testified at the hearing. Tr. 54-60. The ALJ asked the VE to assume a hypothetical individual of the same age, education and work experience of Montanez with the RFC to perform work at any exertional level with the following limitations: limited to simple, routine, repetitive tasks for occupations with no more than occasional interaction with the public or co-workers, i.e., no more than two hours of interaction with the public per day. Tr. 57-58. The VE testified that such an individual would be unable to perform Montanez's past work as a short order cook or drywaller because both jobs would require more than occasional interaction with co-workers. Tr. 57. The VE then testified as to three different jobs within the local, regional or national economy that such an individual could perform. Tr. 58-59. More particularly, the VE indicated that such an individual could be (1) a kitchen helper, medium and unskilled, level 2[3] (910 jobs in the local economy and 95,000 nationally); (2) a packager, light and unskilled, level 2 (875 jobs in the local economy and 90,000 nationally); (3) a janitor, medium and unskilled, level 2 (900 jobs in the local economy and 85,000 nationally). Tr. 58-59. The VE further testified that the same three jobs would be available to the hypothetical individual even if the individual was unable to deal with more than occasional change in a routine work setting. Tr. 59. The VE testified that his testimony was consistent with the DOT.[4] Tr. 60.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

---

[3] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin. December 4, 2000). Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT. *Id.*

[4] The Dictionary of Occupational Titles is published by the Department of Labor. *See* 20 CFR § 404.1566(d)(1).

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

11

The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his March 7, 2011, decision, the ALJ made the following findings:

1. Montanez met the insured status requirements through December 31, 2009. Tr. 13.

2. Montanez had not engaged in substantial gainful activity since December 1, 2008, the alleged onset date. Tr. 13.

3. Montanez had the following severe impairments: affective disorder, post-traumatic stress disorder, personality disorder, and a history of cannabis and cocaine dependence. Tr. 13.

4. Montanez did not have an impairment or combination of impairments that met or medically equal one of the listed impairments.[5] Tr. 13-14.

5. Montanez had the RFC to perform medium work except that he was limited to simple, routine, repetitive tasks and no more than occasional interaction with the public or co-workers. Tr. 15-19.

6. Montanez was unable to perform any past relevant work. Tr. 19-20.

7. Montanez was born on December 20, 1970, and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 20.

8. Montanez has a limited education and is able to communicate in English. Tr. 20.

9. Transferability of job skills was not material to the determination of disability. Tr. 20.

10. Considering Montanez's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Montanez could perform. Tr. 20-21.

---

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

12

Based on the foregoing, the ALJ determined that Montanez had not been under a disability from December 1, 2008, through March 7, 2011, the date of the decision. Tr. 21.

### V. Parties' Arguments

#### A. Plaintiff's Arguments

Montanez presents three arguments in support of his request for a remand for further administrative proceedings. Doc. 14; Doc. 16.

First, he argues that the ALJ's controlling hypothetical and RFC did not adequately accommodate the limitations the ALJ found to exist. Doc. 14, pp. 7-10; Doc. 16, pp 2-4. Montanez relies, in part, on the Sixth Circuit's decision in *Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), to support his argument that the ALJ improperly omitted restrictions reflective of the ALJ's findings of moderate limitations in the area of concentration, persistence or pace. Doc. 14, pp. 7-10; Doc. 16, pp 2-4.

Second, he argues that the ALJ's decision at Step Five that Montanez could perform work as a DOT janitor is not supported by substantial evidence. Doc. 14, pp. 10-13, Doc. 16, pp. 4-6. In support of his second argument, Montanez points to the fact that the DOT janitor job identified by the VE was a semi-skilled job, but the ALJ's RFC limited Montanez to unskilled work. Doc. 14, pp. 10-13, Doc. 16, pp. 4-6. Thus, Montanez asserts that the ALJ's Step Five decision is not supported by substantial evidence. Doc. 14, pp. 10-13, Doc. 16, pp. 4-6.

Third, he argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not follow the two-stage method for evaluating substance abuse. Doc. 14, pp. 13-14, Doc. 16, pp. 6-7. Montanez asserts that, before evaluating whether Montanez would be disabled without consideration of his substance abuse, the ALJ should have first determined whether

Montanez was disabled when his substance abuse is considered. Doc. 14, pp. 13-14, Doc. 16, pp. 6-7.

**B.     Defendant's Arguments**

In response, the Commissioner argues that not every case involving moderate limitations of concentration, persistence or pace requires more than simple, routine, repetitive work restrictions and that, here, the ALJ's VE hypothetical sufficiently accommodated Montanez's moderate limitations in concentration and task persistence. Doc. 15, pp. 9-12. Further, the Commissioner argues that the ALJ's RFC, as a whole, is supported by substantial evidence and therefore the ALJ did not err. Doc. 15, pp. 9-12.

Second, the Commissioner argues that there are other occupations listed in the DOT that are known as "janitor" jobs that are unskilled, thus the VE's incorrect identification of a janitor job that was semi-skilled, rather than unskilled, is not fatal. Doc. 15, pp. 12-13. Further, the Commissioner points out that the VE identified two other unskilled jobs that Montanez could perform (packager and kitchen helper) and, because both of those jobs exist in significant numbers in local and national economy, substantial evidence does support the ALJ's decision. Doc. 15, p. 13.

Third, the Commissioner argues that the ALJ did consider Montanez's history of substance abuse and, because the ALJ did not find Montanez disabled, he was not required to consider whether Montanez's substance abuse was a contributing factor material to a disability determination. Doc. 15, pp. 13-14 (citing 20 C.F.R. §§ 404.1535(a) and 416.935(a)).

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

14

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.     The ALJ's Step Five determination is not supported by substantial evidence**

Although the ALJ found moderate limitations in concentration, persistence or pace, the ALJ did not properly account for those limitations in the RFC or VE hypothetical.  Thus, the ALJ's Step Five determination is not supported by substantial evidence.

To satisfy his burden at Step Five, the Commissioner must make a finding "supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question." *Id.* (citation omitted).  However, if an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations.  *Id.; Ealy*, 594 F.3d at 516-17; *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do").

Although *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010) may not establish a bright-line rule as to how an ALJ must accommodate moderate limitations in concentration, persistence or pace, it is instructive.  An omission of speed and pace-based

15

restrictions from a hypothetical question is reversible error and restrictions to "simple," "routine" or "repetitive" work do not sufficiently incorporate a claimant's moderate limitations in concentration, persistence and pace. *Ealy*, 594 F.3d at 516–17. In *Ealy*, the ALJ found that the claimant had moderate difficulties in concentration, persistence and pace but the ALJ did not ask the vocational expert a hypothetical containing a fair summary of those restrictions. *Id*. at 516. Instead, the ALJ's hypothetical only limited the claimant to simple, repetitive tasks and instructions. *Id*. The Sixth Circuit concluded that the hypothetical did not adequately describe the claimant's limitations and, as a result, the vocational expert's testimony did not constitute substantial evidence in support of the ALJ's Step Five determination. *Id.*

Here, the ALJ himself concluded that Montanez has "moderate levels of deficiencies of concentration, persistence, or pace." Tr. 14. In reaching this conclusion the ALJ noted that Montanez "has difficulty paying attention and does not finish what he starts . . . ." Tr. 18. Notwithstanding the ALJ's finding of moderate limitations in concentration, persistence or pace, the ALJ did not include restrictions reflecting those limitations in the RFC or in his hypothetical to the VE. Tr. 14-15, 57. The ALJ's restriction to "simple, routine, repetitive" tasks is not an adequate substitute for those limitations. *See Ealy*, 594 F.3d at 516-517 (citing *Edwards v. Barnhart,* 383 F.Supp.2d 920, 930–31 (E.D.Mich.2005) for the propositions that "hypothetical limiting claimant to 'jobs entailing no more than simple, routine, unskilled work' not adequate to convey moderate limitation in ability to concentrate, persist, and keep pace" and "'Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job.'"). Here, the VE lists, as possible jobs, kitchen helper (with aka job titles of dish washer, stocker and cook/helper) and packager. Tr. 58-59. It is unclear as to whether these jobs or a certain number of these jobs would be eliminated if quota or pace restrictions had been

16

added to the hypothetical. *See Edwards*, 383 F.Supp.2d at 931. Since the hypothetical does not adequately describe Montanez's mental limitations, the VE's testimony that Montanez could work as a janitor,[6] packager or kitchen helper (Tr. 20-21, 58-59) does not serve as substantial evidence in support of the ALJ's determination that Montanez could perform such work.

In addition to arguing that *Ealy* did not create a bright-line rule requiring remand in cases similar to Montanez's, the Commissioner relies on consultative examining physician Dr. Zeck's opinion that Montanez's "mental ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks is probably not impaired if he can work in isolation and not have to interact or relate to others," (Tr. 305), to argue that the ALJ's RFC and VE hypothetical are supported by substantial evidence. However, the ALJ considered Dr. Zeck's opinions but found that Dr. Zeck's opinions that Montanez had marked limitations in social functioning and marked impairment in his ability to handle the stress of a daily work schedule were not supported by the Nord Center treatment records. Tr. 19. Further, the ALJ did not specifically indicate whether or how he considered Dr. Zeck's opinion that Montanez's ability to maintain attention, concentration, persistence and pace would probably not be impaired if he could work in isolation and not interact with others. Tr. 19. The undersigned will not speculate as to how the ALJ factored this opinion into his ultimate decision to exclude quota and pace limitations from the RFC. Even if the ALJ did consider this opinion, the ALJ ultimately did find moderate limitations in Montanez's ability to maintain concentration, persistence and pace.[7] Tr. 14. Additionally, Dr. Zeck's opinion that Montanez would have no limitations in

---

[6] The Court notes that Montanez separately challenges the VE's testimony concerning the availability of work as a janitor and the ALJ's reliance on that testimony.

[7] The Commissioner also makes note of Nord Center counselor Ms. Redding's statements concerning Montanez's ability to maintain concentration, persistence and pace. Doc. 15, p. 12. However, as discussed in relation to Dr. Zeck's opinions, the ALJ does not indicate how, if at all, Ms. Redding's statements were considered in regard to his conclusion that Montanez had moderate limitations in concentration, persistence or pace. Thus, the Commissioner's attempt to rely on Ms. Redding's statement to demonstrate substantial evidence is unpersuasive.

concentration, persistence or pace was dependent upon Montanez having no interaction with others.  Tr. 305.  However, the ALJ's RFC and VE hypothetical contemplate some interaction with the public and co-workers, i.e., no more than two hours of interaction with the public per day. Tr. 58.

For the foregoing reasons, the ALJ erred in not fully accommodating Montanez's moderate limitations in his ability to maintain concentration, persistence or pace into the RFC and the VE hypothetical.  Accordingly, the undersigned finds that the ALJ's decision is not supported by substantial evidence and recommends that this case be reversed and remanded for further proceedings consistent with this Report and Recommendation.

**B.     Other Issues**

Montanez also argues that the ALJ improperly relied on VE testimony that conflicted with the DOT and that the ALJ did not follow the applicable two-stage method for evaluating Montanez's substance abuse.  Doc. 14, pp. 10-14, Doc. 16, pp. 4-7.  This Report and Recommendation does not address these two additional arguments because the Commissioner's evaluation of and findings relative Montanez's substance abuse and whether there is work available in significant numbers may be impacted by further proceedings on remand.

### VII.  Conclusion and Recommendation

For the foregoing reasons, it is recommended that the Commissioner's decision be **REVERSED AND REMANED** for further proceedings consistent with this Report and Recommendation.[8]

Dated:   November 20, 2012

_Kathleen B. Burke_
Kathleen B. Burke
United States Magistrate Judge

---

[8] This recommendation should not be construed as requiring a determination on remand that Montanez is in fact disabled.

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).